Michael T. Hornak (State Bar No. 81936)
mhornak@rutan.com
Michael D. Adams (State Bar No. 185835)
madams@rutan.com
RUTAN & TUCKER, LLP
611 Anton Boulevard, Fourteenth Floor
Costa Mesa, California 92626-1931
Telephone: 714-641-5100
Facsimile: 714-546-9035

OSTERGAR HUNTER LAW GROUP
Allen C. Ostergar III (State Bar No. 166411)
aostergar@ostergar.com
27101 Puerta Real, Suite 450
Mission Viejo, CA 92691
Telephone: 949-305-4590
Facsimile: 949-305-4591

Attorneys for Plaintiff & Counter-defendant
BUY.COM INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| BUY.COM INC., <br><br> Plaintiff, <br><br> v. <br><br> WARRANTECH CONSUMER PRODUCT SERVICES, INC., <br><br> Defendants. | Case No. SACV 08-1453 JVS (MLGx) <br><br> **DECLARATION OF EOIN MATTHEWS IN SUPPORT OF BUY.COM, INC.'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT/PARTIAL SUMMARY ADJUDICATION** <br><br> Date: December 21, 2009 <br> Time: 1:30 p.m. <br> Courtroom: 10C <br> Judge: Honorable James V. Selna |

I, Eoin Matthew, declare as follows:

1. I am Vice President of Business Development for Buy.com, Inc. I have held this position from the end of 2005 through July 2008, and from April 2009 to the present. I have personal knowledge of the matters hereafter set forth and if called could and would testify competently thereto.

2. I personally negotiated the Marketing Agreement on behalf of Buy.com. To my knowledge, Buy.com was never offered a "traditional wholesale model" as described in the Declaration of Sean Hicks.

3. The relationship with Warrantech was essentially an advertising deal in which Warrantech bought advertising space on the Buy.com website in the form of a warranty tab in the header of the Buy.com website. When a Buy.com customer clicked on the warranty header or other links throughout the Buy.com website, the customer would be directed to a website build and hosted by Warrantech.

4. Because the proposed relationship with Warrantech was essentially an advertising deal, Buy.com wanted a $50,000 per month minimum payment, which was Buy.com's target price for placing an advertising "tab" link on its website. For example, Buy.com had previously sold an advertising "tab" link on its website to a travel company, for which Buy.com received $40,000 per month and to a cell phone company, for which Buy.com received over $50,000 per month.

5. The minimum monthly payment in the Marketing Agreement was specifically negotiated in light of Buy.com's 2006 historical warranty sales, which I shared with Warrantech. Buy.com had not enjoyed $2,000,000 in annual warranty sales in 2006, and I never told Warrantech that it had. To my knowledge, no one else from Buy.com ever made this alleged representation to Warrantech. Rather, as noted, I shared with Warrantech information concerning Buy.com's warranty sales in 2006. That information was accurate.

6. The Hicks Declaration states "BUY agreed to immediately establish upon the execution of the agreement" the marketing placements identified in Exhibit B to the Marketing Agreement." (Hicks Dec. ¶ 5). Buy.com could not possibly have agreed to do so because most of the marketing placements required that Warrantech first build the website from which the warranties would be sold, which had not been accomplished upon execution of the agreement, and was ultimately not accomplished by Warrantech for approximately four or five months. For example,

Buy.com could not place a warranty tab on its website pursuant to Section i until after Warrantech had a functioning website to direct traffic to. It was simply never understood or agreed that Buy.com would immediately establish the marketing placements in Exhibit B to the Marketing Agreement immediately upon execution. Indeed, it would have been impossible.

7. The Hicks Declaration states "BUY only placed the tab on its website after I complained to BUY that BUY had still not placed the tab on its website" (Hicks Dec. ¶ 5). Contrary to Mr. Hicks assertion, the Buy.com team was constantly urging the Warrantech team to complete development of its website during the summer and autumn of 2007. As what we considered to be a major component of the advertising deal, we could not bill for or recognize revenue on the deal until the Warrantech website was up and the link live from the Buy.com header to the Warrantech tab. It was in BUY'sinterest for the header link to be live and Warrantech's technical shortcomings delayed that launch until October 1. It was only when the header link along with the other placements in October were completed that we started to invoice Warrantech,

8. Mr Hicks asserts that he would have "insisted that BUY place the tab on the top of the website as "Warranty Store." Had BUY placed the tab in a more prominent position on BUY's website as agreed, I believe that more extended warranties would have been purchased by BUY's customers." The link to Warranty tab was placed in the Buy.com headers which is the most prominent navigation tool on the Buy.com website – it is at the top of millions of pages on the Buy.com website. The link was named "Warranties" and received thousands of clicks each month from Buy.com visitors who were then directed to the Warrantech site. As such this was a highly successful placement and was well conceived and correctly implemented on Buy.com's part. Warrantech's falure to convert more of those visitors to customers is a reflection of its own shortcoming in the implementation of an ecommerce website. This was a significant failure on their part and their

1  ineptness in conversion efforts, when discovered, and their ongoing failure to
2  improve conversion, is what most concerned Buy.com.
3     9.  In Section 9, Mr Hicks asserts when talking about a User Account page
4  that "BUY never created such a link and when I discussed it with Eoin Matthews he
5  told me that BUY did not have the resources to implement such a link." In fact
6  Buy.com implemented and made available to its customers such a link and Mr Hicks
7  was notified when this link went live. Any delays in launching this link were
8  because Warrantech introduced a previously unspecified requirement that the link
9  only be available within 30 days of a customers purchase of a product eligible for an
10 extended warranty. This was a new requirement which Buy.com accommodated and
11 speedily introduced even though it was the busiest time of the year for the
12 company's developers.
13    10. With respect to Section iv of the Marketing Agreement (pre-warranty
14 expiration emails), I understood Buy.com's obligation to require it to send out
15 emails to customers letting them know their warranty was about to expire and
16 offering them the opportunity to purchase an extended warranty. During
17 negotiations of the Marketing Agreement, Warrantech told me that they could
18 provide Buy.com with data on manufacturer's warranties for products sold by
19 Buy.com. This data was necessary to allow Buy.com to send out pre-warranty
20 expiration emails, and was data that Buy.com did not have in any usable form.
21 Buy.com was thus prevented from complying with the marketing placement
22 obligations in Section iv. Ultimately, Warrantech admitted to me that they could not
23 obtain the required data and so it was agreed that we would not pursue sending pre-
24 warranty expiration emails. Furthermore, Warrantech requested of Buy.com to
25 restrict the availability and promotion of Warrantech warranty products only to
26 customers who had purchased products in the prior 30 days. This was because of
27 new risk concerns that Warrantech had post-execution about the warranty expiration
28 emails. Accommodating such a request from Warrantech implicitly meant that

Buy.com could not implement the warranty expiration emails and prevented BUY from doing so even though Buy.com had developed for such an implementation.

11. Mr Hicks declares in Paragraph 12 that BUY was obliged to send "inserts" to its customers. Such inserts are printed materials which an advertiser would provide to Buy.com. Warrantech never provided such inserts and, when notified of the need for them to print such inserts, elected not to provide them to Buy.com. Therefore Warrantech prevented Buy.com from sending the "inserts" by failing to meet its obligations.

12. In Paragraphs 13 and 14, Mr Hicks assets that BUY did not send "new product announcements" and quarterly emails and "BUY did not send email messages" referring customers to Warrantech's warranty store. Contrary to Mr Hicks assertion, BUY implemented links to Warrantech's warranty store in html emails sent to its customers starting in October 2007 when Warrantech made available its warranty store. In effect, BUY overdelivered on this requirement by sending the emails on a weekly basis.

13. Sean Hicks declares in Paragraph 6 of his declaration that "as early as May 9, 2007, a few days after the Agreement was to take effect, BUY's Eoin Matthews expressed concern that BUY was having serious technical problems which compromised its ability to comply with the *User Account Page* term of the contract." That is not true. In fact, my email referenced in Paragraph 6 of the Hicks Declaration, which Mr. Hicks says contains my supposed expression of concern, refers to mock-ups of what the account page would look like. It is not discussing anything technical. Moreover, May 9, 2007 was four of five months before Warrantech completed the build of its website, which was a pre-requisite for Buy.com to link to the Warrantech site. There was thus no technical issue in May concerning complying with the User Account Page term other than the fact that any such linking was a physical impossibility until such time as Warrantech completed the build of its website. In fact, the email chain starting at May 9th shows Buy.com's

planning for the implementation of the warranty expiration emails and site placements based on same said data. As explicitly stated in those emails, Buy.com had been instructed by Warrantech that Warrantech would provide the data for those placements – this was data that Warrantech ultimately could not or would not provide and so our work was for naught because of Warrantech's failures.

14. Although the Marketing Agreement was executed in May 2007, the launch of the program did not begin until October 2007 because Warrantech did not complete the build of its website until just before October 2007. As noted, it was impossible for Buy.com to start directing traffic to Warrantech until such time as Warrantech had built the site to which the traffic would be directed.

15. The Hicks Declaration at Paragraph 8 states that he discovered in October 2007 that Buy.com had finally placed the tab on its site. Buy.com did not place the tab on its website until then because that is when Warrantech completed the build of their website. Not placing the tab on the Buy.com website prior to October 2007 had nothing to do with technical problems with Buy.com, but rather with Warrantech's technical problems building their website. Buy.com worked closely with the Warrantech team during the summer months to plan for this launch and aided the Warrantech team however we could to accelerate the launch. On several occasions we had to go back to our existing warranty partner, WACA, to extend their placements of the Buy.com site because of Warrantech's failure to build a functioning site.

16. Contrary to the general statement in the Hicks Declaration, I never advised Mr. Hicks that Buy.com could not perform the obligations set forth in Exhibit B to the Marketing Agreement.

17. The discussion around eBay being a priority had nothing to do with Buy.com's obligations under Exhibit B to the Marketing Agreement. Buy.com performed those obligations in a timely manner. Discussions about prioritizing the eBay project concerned prioritizing that project over the project to change to a

basket implementation. The basket implementation was not required by the Marketing Agreement. Rather, the basket implementation was something that Buy.com could elect to do in its sole discretion as per Paragraph 1 of the Marketing Agreement.

18. Changing to the basket implementation had nothing to do with alleged problems Buy.com was having setting up a system whereby its customers were directed to Warrantech's website. Buy.com approached Warrantech about changing to a basket implementation because Warrantech's low sales indicated it was having problems converting sales from the customers that were directed to Warrantech from Buy.com. Buy.com was disappointed with Warrantech's ability to convert sales because Buy.com was directing to Warrantech tens of thousands of highly qualified customers per month (i.e., customers who were interested in purchasing a warranty as evidenced by the fact that they were directed to the Warrantech website after having clicked on a warranty link). Moreover, it became evident that, not only did Warrantech have little experience with internet sales, Warrantech did not have the analytical tools that an e-commerce business should have in order to assess the effectiveness of its online sales efforts. In contrast, Buy.com is highly sophisticated in online sales and has extensive analytical tools that allow Buy.com to constantly monitor and improve upon its online sales on its own websites. Thus, after it became apparent that Warrantech was having problems converting sales and was unable to make significant improvements, Buy.com approached Warrantech with a proposal that Buy.com would change to a basket implementation if Warrantech agreed to come current on its past due amounts.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct and that this declaration was executed by me on December 4, 2009 in Galway, Ireland.

Eoin Matthews